**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| YACINE DIENG<br><br>    Plaintiff,<br>v.<br><br>AMERICAN INSTITUTES FOR<br>RESEARCH IN THE BEHAVIORAL<br>SCIENCES,<br><br>    Defendant. |

No. 18-cv-1220 (EGS)

<u>**MEMORANDUM OPINION**</u>

Plaintiff Yacine Dieng ("Ms. Dieng") brings this action against Defendant American Institutes for Research in the Behavioral Sciences ("AIR") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and the District of Columbia's Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, arising out of the termination of her employment. Ms. Dieng, an African-American woman, alleges that her supervisors at AIR subjected her to discrimination, a hostile work environment, and retaliation on the basis of her race and gender. Pending before the Court is AIR's motion to dismiss. Upon careful consideration of the motion, the opposition, the reply thereto, the applicable law, and the entire record herein, the Court **GRANTS IN PART** and **DENIES IN PART** AIR's Motion to Dismiss. The Court **DISMISSES WITHOUT PREJUDICE** Ms. Dieng's hostile work environment and gender discrimination claims.

## I. Background

### A. Factual Background

The following facts reflect the allegations in the operative complaint and the documents incorporated by reference therein, which the Court assumes are true for the purposes of deciding this motion and construes in Ms. Dieng's favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015). In February 2013, AIR hired Ms. Dieng, an African-American female, as a Senior Database Engineer in its "ORS Department." Am. Compl., ECF No. 8 at 2 ¶ 5.[1] With more than 1,800 employees, *id.* at 2 ¶ 9, AIR is a non-profit organization with a mission to "conduct and apply the best behavioral and social sciences research and evaluation towards improving people's lives[,]" Def.'s Ex. 1, ECF No. 9-2 at 1. While working there, Ms. Dieng became an "expert at fixing bugs[.]" Am. Compl., ECF No. 8 at 2 ¶ 10. She often worked "every single day of the week including week nights and weekends[,] *id.* at 5 ¶ 29, and she was allowed to telecommute without prior approval from her supervisors, *id.* at 4 ¶ 22. AIR eventually promoted her to Lead Database Engineer II. *Id.* at 2 ¶ 5. On February 2, 2018, AIR terminated her employment as a result of "performance issues" and

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

"insubordination." *Id.* at 8 ¶ 44.

During her first year, Ms. Dieng was subjected to "abusive discriminatory behavior" by her Technical Project Manager and she reported that "abusive treatment" to her Staff Manager. *Id.* at 6 ¶ 38. Ms. Dieng was the only African-American female in a group within the ORS Department. *Id.* at 2 ¶ 12. According to Ms. Dieng, "upper management and the whole ORS department group" witnessed "[s]uch repeated abusive behavior," including one incident where the Technical Project Manager "yelled on top of his lungs for [Ms. Dieng] to sit down and shut up in [the] middle of her presentation." *Id.* at 6-7 ¶ 38. The Technical Project Manager's behavior "seem[ed] to have resolved itself in the later years." *Id.* at 6 ¶ 38.

In September 2015, however, "it became necessary for Ms. Dieng to seek assistance from Human Resources due to a workplace conflict which was created by her Project Manager's . . . disrespectful and abusive behavior in front of her office co-workers." *Id.* at 2 ¶ 11. Ms. Dieng's Project Manager yelled at her, "demeaning and embarrassing her" during staff meetings. *Id.* at 3 ¶ 13. Ms. Dieng asserts that "[n]o one else was treated that way" and that "[s]he was the only person abusively reprimanded although others had made the exact same comment without receiving any verbal abuse." *Id.* At some point, Ms. Dieng decided to attend the staff meetings via telephone as she

waited for AIR to resolve the dispute. *Id.* Ms. Dieng reported her "concerns about mistreatment to her Staff Manager, who refused to intervene and commanded her to start attending meetings physically again[.]" *Id.* at 3 ¶ 14.

Ms. Dieng then informed the Human Resources department about her concerns, explaining that her Project Manager discriminated against her and treated her differently from "every other employee in the group" who were "either Caucasian or a co-national of the [Project Manager] (Indian descent)[.]" *Id.* at 3 ¶ 16. In response, the Human Resources department told Ms. Dieng to "handle the conflict alone." *Id.* at 3 ¶ 17. At some point, the Human Resources department facilitated a meeting with the Project Manager and Ms. Dieng. *Id.* at 3 ¶ 18. The Project Manager apologized to Ms. Dieng at that meeting. *Id.* But the Project Manager's apology did not end Ms. Dieng's issues at AIR. *See id.* at 3 ¶ 19. According to Ms. Dieng, the apology was short-lived because the Project Manager became very hostile towards her and the Project Manager "started working very hard" to terminate her employment. *Id.*

Ms. Dieng alleges the following grievances: (1) the Project Manager ignored Ms. Dieng at staff meetings, *id.* at 4 ¶ 19; (2) the Staff Manager "constant[ly] question[ed]" her work and made "irrelevant probes," *id.* at 4 ¶ 21; (3) the Staff Manager asserted false claims that her "code was buggy" based on a

report issued by the Project Manager, *id.*; (4) the Project Manager's reports questioned "Ms. Dieng's ongoing ad hoc telecommuting" during the summer of 2017, *id.* at 4 ¶ 22; (5) the Staff Manager required Ms. Dieng to seek prior approval from senior management before telecommuting while her team members telecommuted without prior approval, *id.*; (6) the Staff Manager "sternly reprimand[ed]" her for telecommuting after the Staff Manager verbally approved her request to do so, *id.* at 5 ¶ 26; (7) the Staff Manager labeled Ms. Dieng as insubordinate when she refused to follow an order generated by the Project Manager, *id.* at 5 ¶ 27; (8) the Staff Manager "put in writing a blatant lie" in her performance evaluation—for the period of January 1, 2016 to December 31, 2016—that she received "negative feedback" from her co-workers about her work product, *id.* at 6 ¶ 33, but the Staff Manager did "not lie on evaluations of similarly situated Caucasians/[the Project Manager's] co-Nationals co-workers[,]" *id.* at 6 ¶ 34; and (9) neither the Project Manager nor the Staff Manager responded to Ms. Dieng's repeated verbal and written requests to dispute the "false evaluation," *id.* at 6 ¶ 35.

Ms. Dieng also asserts the following allegations: (1) the Staff Manager raised "false performance issues" about Ms. Dieng at a meeting with her and Human Resources personnel, *id.* at 6 ¶ 37; (2) the Staff Manager accused Ms. Dieng of "not getting

along with the whole team," *id*. at 6 ¶ 38; (3) the Staff Manager initially rejected Ms. Dieng's request for a new laptop, but the Staff Manager later approved her request after "[o]ne of the [Project Manager's] co-national co-workers" explained that Ms. Dieng needed a new laptop due to certain issues with the old one, *id*. at 7 ¶ 42; (4) the Senior Manager accused Ms. Dieng of "touching the production system without permission" in January 2018 even though she had "followed the same procedure for the past [five] years by requesting permission from her [Project Manager]," *id*. at 7 ¶ 43; and (5) management revoked Ms. Dieng's access to the production system even though none of her "Caucasian/[Project Manager's] co-nationals co-workers" received the same treatment when they touched the production system, *id*. at 8 ¶ 43. AIR ultimately fired Ms. Dieng for insubordination and performance issues. *Id*. at 8 ¶ 44.

Ms. Dieng asserts that AIR's "prior mistreatment" and her termination were "because of her race and in retaliation for her complaints." *Id*. at 8 ¶ 45. She also alleges that AIR's mistreatment created a hostile work environment. *Id*. After her termination in February 2018, Ms. Dieng filed a "timely complaint" with the United States Equal Employment Opportunity Commission ("EEOC"). *Id*. at 8 ¶ 46. On February 22, 2018, the EEOC issued a notice of right to file suit. *Id*. at 8 ¶ 47.

## B. Procedural History

On May 24, 2018, Ms. Dieng filed this employment discrimination lawsuit, asserting Title VII and DCHRA claims against AIR. *See* Compl., ECF No. 1 at 5-6. AIR moved to dismiss the initial complaint on August 13, 2018, *see generally* Def.'s Mot. to Dismiss, ECF No. 6, and the Court denied without prejudice AIR's motion after Ms. Dieng filed an Amended Complaint on September 4, 2018. *See* Min. Order of Sept. 6, 2018; *see generally* Am. Compl., ECF No. 8.[2] Ms. Dieng's allegations against AIR fall into three categories: (1) AIR created a hostile work environment because of her race and gender in violation of Title VII and DCHRA; (2) AIR discriminated against her and terminated her because of her race and gender in violation of Title VII and DCHRA; and (3) AIR retaliated against her for engaging in protected activities in violation of Title VII and DCHRA. *See* Am. Compl., ECF No. 8 at 9-10.[3]

---

[2] The Amended Complaint asserts the following six counts: (1) "Hostile Work Environment Created Against Plaintiff Because of Her Race and Gender" under Title VII; (2) "Hostile Work Environment Created Against Plaintiff Because of Her Race and Gender" under DCHRA; (3) "Termination Taken Against Plaintiff on the Basis of Race and Gender" under Title VII; (4) "Termination Action Taken Against Plaintiff on the Basis of Race and Gender" under DCHRA; (5) "Termination Action Taken Against Plaintiff on the Basis of Retaliation" under Title VII; and (6) "Termination Action Taken Against Plaintiff on the Basis of Retaliation" under DCHRA. Am. Compl., ECF No. 8 at 9-10.

[3] The Amended Complaint includes the word "Gender" in the headings for Counts I through IV. Am. Compl., ECF No. 8 at 9. Ms. Dieng alleges that she is female. *Id*. at 2 ¶ 4; 2 ¶ 12. To

AIR filed its motion to dismiss the Amended Complaint on September 18, 2018, *see* Def.'s Mot. to Dismiss, ECF No. 9, Ms. Dieng filed her opposition brief on October 9, 2018, *see* Pl.'s Opp'n, ECF No. 11, and AIR filed its reply brief on October 16, 2018, *see* Def.'s Reply, ECF No. 12. The motion is ripe and ready for the Court's adjudication.[4]

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court will dismiss a claim if the complaint fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell*

---

the extent that Ms. Dieng seeks to assert claims based on gender, AIR argues that Ms. Dieng fails to include any factual allegations to support her hostile work environment and discrimination claims based on her gender. Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem."), ECF No. 9-1 at 17; *see also* Def.'s Reply, ECF No. 12 at 1-2 (citing LCvR 7(b)). By not responding to this argument in her opposition brief, *see generally* Pl.'s Opp'n, ECF No. 11, Ms. Dieng has conceded it. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[Local Civil Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004))). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Ms. Dieng's hostile work environment and discrimination claims based on her gender (Counts I, II, III, and IV).

[4] AIR requests an oral hearing on its motion to dismiss. *See* Def.'s Mot. to Dismiss, ECF No. 9 at 1. The Court will not exercise its discretion to hold a hearing. *See* LCvR 7(f). The Court therefore **DENIES** AIR's request for an oral hearing.

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted).

A complaint survives a Rule 12(b)(6) motion only if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint alleging facts which are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## III. Analysis

AIR advances three primary arguments for dismissal under Rule 12(b)(6). *See* Def.'s Mem., ECF No. 9-1 at 8-17. First, Ms. Dieng has not stated a discrimination claim because she alleges no facts from which it can be inferred that race was a factor in AIR's decision to terminate her. *Id.* at 14-15. Next, Ms. Dieng fails to state a retaliation claim because the Project Manager's

apology resolved the one arguable protected activity (*i.e.* her 2015 complaint to AIR's Human Resources department) and there are no allegations that the discriminatory acts were connected to the 2015 protected activity. *Id*. at 15-17. Finally, Ms. Dieng fails to state a hostile work environment claim on the basis of her race because the alleged "isolated events" of hostility were not "racially charged," "racially insensitive," "severe," or "pervasive" to constitute such a claim. *Id*. at 10. The Court addresses each claim in turn.[5]

### A. Discrimination Claims

The Court first considers Ms. Dieng's discrimination claims based on her race. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's *race*, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Ms. Dieng must establish "two essential elements": "(i) [she] suffered an adverse employment action (ii) because of

---

[5] The Court will analyze Ms. Dieng's Title VII and DCHRA claims together because the legal standards for both statutes are substantively the same. *See, e.g.*, *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (recognizing that the analysis is the same for Title VII and DCHRA claims and that "Title VII claims and DCHRA claims thus rise and fall together"); *Williams v. District of Columbia*, 317 F. Supp. 3d 195, 199 (D.D.C. 2018) (Sullivan, J.) (applying the same analysis to Title VII and DCHRA claims).

the [her] race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *see also Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) ("An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." (citations and internal quotation marks omitted)). "To prevail on a motion to dismiss, it is not necessary to establish a *prima facie* case." *Greer v. Bd. of Trs. of the Univ. of the D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 162 (D.C. Cir. 2015)). Nonetheless, Ms. Dieng "must allege facts that, if true, would establish the elements of each claim." *Id.* (citation and internal quotation marks omitted).

It is undisputed that Ms. Dieng asserts that AIR's unlawful actions resulted in her termination on the basis of her race. *See* Am. Compl., ECF No. 8 at 2 ¶¶ 4, 6, 12. AIR argues that Ms. Dieng has "alleged nothing more than she is African American and was terminated[,]" Def.'s Mem., ECF No. 9-1 at 14, and that Ms. Dieng failed to address the arguments in its motion to dismiss as to Counts III and IV in which Ms. Dieng alleges that she was unlawfully terminated based on her race, *see* Def.'s Reply, ECF

No. 12 at 1-2. The Court disagrees.

While the "Argument" section in Ms. Dieng's opposition brief lacks a separate subheading for her discrimination claims and her arguments could have been provided in a more direct and clear manner to support those claims, *see* Pl.'s Opp'n, ECF No. 11 at 7-12, Ms. Dieng is asserting disparate treatment claims based on her allegations of racial discrimination in light of her arguments under the "Hostile Work Environment" subheading, *see id*. at 7. Ms. Dieng explicitly references "numerous incidents" of "disparate treatment," *id*. at 9, including her supervisor yelling at her and ignoring her during staff meetings, *id*. at 2. Ms. Dieng contends that her grievances at AIR escalated when she reported her "race claim" to the Human Resources department, *id*. at 10, and that she was a "victim of racial discrimination," *id*. at 2. Because the Human Resources department told her to "handle the conflict alone," Am. Compl., ECF No. 8 at 3 ¶ 17, Ms. Dieng asserts that she reminded the department of AIR's policy that the department must be "engage[d] in the diversity area to ensure that every employee is respected and feels valued[,]" Pl.'s Opp'n, ECF No. 11 at 2. According to Ms. Dieng, she continued to experience mistreatment after she met with the Human Resources department. *See id*. at 2.

Ms. Dieng, "as the only person of color" in a particular group at AIR, argues that she was treated differently than her

white co-workers, *id.* at 8, because her supervisors required her to seek prior approval from management before telecommuting, whereas her white co-workers could telecommute without prior approval, *id.* at 9. Ms. Dieng points out that her supervisors inserted falsehoods and mischaracterizations in her performance evaluations, whereas the evaluations of her white co-workers included true and accurate information about their performance. *Id.* at 4, 8-10, 10 n.2. Ms. Dieng alleges that her supervisors falsely accused her of touching a production system without permission, but such permission was not required for her white co-workers. *Id.* at 5 (citing Am. Compl., ECF No. 8 at 7 ¶ 43). Indeed, she points out that she requested permission based on the same procedure she had followed for five years. *Id.* And her co-workers touched the production system without permission, but she was the only employee to be reprimanded and fired. Am. Compl., ECF No. 8 at 8 ¶ 43. She asserts that a week after she met with the Human Resources department and her supervisors concerning the accusations that she impermissibly touched the production system, AIR terminated her. Pl.'s Opp'n, ECF No. 11 at 5; *see also* Am. Compl., ECF No. 8 at 7-8 ¶ 43.

AIR's next argument—that Ms. Dieng has alleged nothing more than she is African American and was terminated—is unavailing. *See, e.g.*, Def.'s Mem., ECF No. 9-1 at 14; Def.'s Reply, ECF No. 12 at 2. Construing the allegations in the light most favorable

to Ms. Dieng, the Court therefore finds that she has alleged
enough facts to state a disparate treatment claim based on her
race to survive the motion to dismiss. *See, e.g.*, *Jackson v.
Dist. Hosp. Partners, L.P.*, No. CV 18-1978 (ABJ), 2019 WL
3502389, at *5 (D.D.C. Aug. 1, 2019) (holding that plaintiff
stated a disparate treatment claim on the basis of race, sex,
and religious discrimination based on allegations that he was
wrongfully terminated for raising his voice and "other non-
Muslim, non-African-American, and female employees were treated
more favorably because they were not fired despite engaging in
similar conduct"); *Winston v. Clough*, 712 F. Supp. 2d 1, 10
(D.D.C. 2010) (holding that plaintiff stated a claim for racial
discrimination by alleging that he was subjected to discipline
that "was motivated by [his] race and color" and "that other co-
workers outside [his] protected class" engaged in the same
behavior for which he was disciplined "yet none was suspended or
disciplined for it"). Accordingly, the Court **DENIES** AIR's motion
to dismiss as to Ms. Dieng's discrimination claims based on race
(Counts III and IV).

### B. Retaliation Claims

The Court next turns to Ms. Dieng's retaliation claims.
Title VII "both prohibits employers from engaging in employment
practices that discriminate on the basis of race, *see* 42 U.S.C.
§ 2000e-2(a), and bars them from retaliating against an employee

'because [she] has opposed any [such] practice,' *id.* § 2000e-3(a)." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (citation omitted). "In order to establish a *prima facie* case of retaliation, a plaintiff must show (1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment action; and (3) there is a causal connection between the two." *Jackson*, 2019 WL 3502389, at *5. "[A] plaintiff need not plead each element of his *prima facie* retaliation case to survive a motion to dismiss." *Id.* For the reasons explained below, Ms. Dieng has stated claims for retaliation.

Here, it is undisputed that Ms. Dieng has sufficiently alleged facts for the first two elements because she engaged in protected activity when she complained to the Human Resources department about her mistreatment in September 2015, specifically about her Project Manager's "disrespectful and abusive behavior." Am. Compl., ECF No. 8 at 2 ¶ 11. There is no dispute that Ms. Dieng's termination in February 2018 constitutes a materially adverse action. *See id.* at 2 ¶ 6, 8 ¶ 44. The remaining issue is whether Ms. Dieng has alleged sufficient facts for a causal connection between the protected activity in 2015 and the termination in 2018. AIR argues, and the Court disagrees, that "there are no allegations that Ms. Dieng complained to Human Resources or anyone in AIR

[management] about the alleged hostile actions" and that the
Program Manager resolved her claims of mistreatment with an
apology. Def.'s Mem., ECF No. 9-1 at 15. Indeed, Ms. Dieng
alleges that she reported her claims of mistreatment to her
Staff Manager. Am. Compl., ECF No. 8 at 3 ¶ 14. And Ms. Dieng
asserts that she reported her Technical Project Manager's
"abusive discriminatory behavior" and "abusive treatment" to her
Staff Manager during her first year in 2013. *Id.* at 6 ¶ 38.

Ms. Dieng alleges at least seven retaliatory actions that
were taken by her supervisors after she complained about her
mistreatment: (1) she was ignored at staff meetings, *id.* at 4 ¶
19; (2) her managers constantly questioned her work and made
irrelevant probes, *id.* at 4 ¶ 21; (3) she was required to seek
prior approval from senior management before telecommuting while
her team members telecommuted without such approval, *id.* at 4 ¶
22; (4) the Staff Manager reprimanded her for telecommuting
after verbally approving her request to do so, *id.* at 5 ¶ 26;
(5) Ms. Dieng lost her telecommuting privileges, *id.* at 5 ¶ 30;
(6) her supervisors ignored her repeated verbal and written
requests to address her concerns with her evaluation, *id.* at 6 ¶
35; (7) her supervisors rejected her initial request for a new
laptop, *id.* at 7 ¶ 42; and (8) her supervisors revoked her
access to the production system, *id.* at 8 ¶ 43.

Next, AIR contends that Ms. Dieng does not allege that the

alleged incidents in 2017 and 2018 were connected to her 2015 protected activity, and that "given the passage of time, there is no reasonable inference that can be made to suggest that what Ms. Dieng claims to have experienced in 2017 and 2018 was in any way related to her alleged protected activity in 2015." Def.'s Mem., ECF No. 9-1 at 16. AIR correctly notes that "'[t]emporal proximity can indeed support an inference of causation, . . ., but only where the two events are 'very close' in time.'" *Id.* (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)). AIR argues that the Senior Manager—who accused Ms. Dieng of impermissibly touching the production system that led to her termination—lacked any knowledge about Ms. Dieng's protected activity in 2015. *Id.* at 17.

"[U]nder some circumstances, temporal proximity between an employer's knowledge of protected activity and an adverse personnel action may *alone* be sufficient to raise an inference of causation." *Harris*, 791 F.3d at 69 (emphasis added); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 316 (D.D.C. 2017) ("If the causation element is predicated on temporal proximity alone, however, that proximity must be 'very close.'" (citation omitted)). Here, Ms. Dieng asserts that she complained to the Human Resources department in September 2015 about her mistreatment and that she was terminated in February 2018. *See* Am. Compl., ECF No. 8 at 2 ¶ 11, 3 ¶ 14. Ms. Dieng also reported

her mistreatment to her Staff Manager in 2013. *Id.* at 6 ¶ 38.
Viewing Ms. Dieng's allegations in the light most favorable to
her, the allegations of her complaints in 2013 and 2015 were not
"very close" in time to her termination. *Clark Cty. Sch. Dist.
v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that a three- or
four-month period between an adverse action and protected
activity is insufficient to show a causal connection, and a
twenty-month period "suggests, by itself, no causality at all");
*see also Mason v. Geithner*, 811 F. Supp. 2d 128, 189 (D.D.C.
2011) (finding that "approximately two years had elapsed since
[the plaintiff] had last engaged in protected activity in
connection with the [retaliatory act], precluding any potential
inference of retaliation based on temporal proximity."), *aff'd*,
492 F. App'x 122 (D.C. Cir. 2012).

Relevant here, however, is AIR's denial of Ms. Dieng's
request to telecommute. *See* Am. Compl., ECF No. 8 at 5 ¶¶ 26-30.
Ms. Dieng met with the Human Resources department about the
accusations of insubordination where she "explained herself,"
*id.* at 5 ¶ 27, and the meeting appears to have taken place
around the time that Ms. Dieng received a "harsh reprimand about
telecommuting" from her Staff Manager, *id.* at 6 at ¶ 28. An
employee "can engage in 'protected activity' by verbally
complaining to [her] employer about unlawful discrimination."
*Jackson*, 2019 WL 3502389 at *6. The United States Court of

Appeals for the District of Columbia Circuit ("D.C. Circuit") has made clear that a denial of a request to telecommute "could constitute an adverse employment action." *Kline v. Berry*, 404 F. App'x 505, 506 (D.C. Cir. 2010); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[R]etaliation that produces an injury or harm" is actionable if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (citation omitted)). Depending on the context, "[a] schedule change in an employee's work schedule" or exclusion of an employee "from a weekly training lunch" could deter a reasonable employee from complaining and therefore might be actionable. *White*, 548 U.S. at 69.

Ms. Dieng alleges that the denial of her telecommuting privileges—privileges that were enjoyed by her team members—was disruptive. *See* Am. Compl., ECF No. 8 at 5 ¶ 30. Ms. Dieng argues that the "denial of teleworking" impacted "her performance." Pl.'s Opp'n, ECF No. 11 at 10. The Amended Complaint does not provide the exact date for Ms. Dieng's "loss of her telecommuting" privileges. Am. Compl., ECF No. 8 at 5 ¶ 30. Assuming that the denial of Ms. Dieng's telecommuting privileges were "very close" in time to her complaints to AIR's management and the Human Resources department about her

mistreatment and reprimand for telecommuting, the Court may infer a causal relationship. *See Townsend*, 236 F. Supp. 3d at 316.

"At the motion to dismiss stage, the hurdle of alleging a causal link is not a high one." *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 38 (D.D.C. 2018). "Temporal proximity, for example, may suffice . . . as may other factual allegations that, construed in the light most favorable to the plaintiff, would 'plausibly' establish this element of [the retaliation] claim." *Id*. (citations omitted). The D.C. Circuit's decision in *Harris v. District of Columbia Water & Sewer Authority*, 791 F.3d 65, 68-71 (D.C. Cir. 2015) is instructive. There, the D.C. Circuit reversed a district court's dismissal of a complaint while declining to "decide whether a five-month time lag without more would be sufficient to render [the plaintiff's] claim plausible because his complaint alleged more" in support of his retaliation claim. *Harris*, 791 F.3d at 69. The D.C. Circuit considered other allegations in the plaintiff's complaint, including that the plaintiff was "regularly commended for his work" and made "numerous contributions to the improvement of" the employer's operations, as supporting the inference, at the motion to dismiss stage, that the employer terminated the plaintiff in retaliation. *Id*. (internal quotation marks and citations omitted).

"The only question before [the Court] is whether [Ms. Dieng has] alleged facts that, taken as true, render [her] claim of retaliation plausible." *Id*. at 70; *see also Iqbal*, 556 U.S. at 679 ("[A] complaint that states a plausible claim for relief survives a motion to dismiss."). Ms. Dieng has done so. Ms. Dieng alleges that she "became the go-to person as an expert at fixing bugs, leading to her promotion as Lead Database Engineer." Am. Compl., ECF No. 8 at 2 ¶ 10. For the period of January 1, 2016 to December 31, 2016, Ms. Dieng received an overall performance rating of "Consistently Met Expectations" in her performance evaluation at AIR. *Id*. at 6 ¶ 31. In fact, her Manager stated that "[o]verall, the effort [Ms. Dieng] puts forth, particularly for night and weekend deployments is appreciated, and she is a key contributor on the team." Def.'s Ex. 1, ECF No. 9-2 at 2. With the exception of the Technical Project Manager who exhibited "abusive discriminatory behavior" towards her, Ms. Dieng alleges that she got along with the whole team. Am. Compl., ECF No. 8 at 6 ¶ 38. Ms. Dieng challenges the stated reasons for her termination—"performance issues" and "insubordination." *Id*. at 8 ¶ 44.

"If true, these facts would show that [Ms. Dieng's] termination was not attributable to [one] of the 'two most common legitimate reasons' for termination: 'performance below the employer's legitimate expectations[.]'" *Harris*, 791 F.3d at

69 (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). In determining that the plaintiff's complaint in *Harris* alleged facts that, if shown, would be sufficient to state a *prime facie* case of retaliation, the D.C. Circuit explained that a showing that the plaintiff's termination was not attributable to the plaintiff's performance below his employer's legitimate expectations was "sufficient to satisfy a plaintiff's burden of establishing a prima facie case at the summary judgment stage[.]" *Id.* (citations omitted); *see also Calhoun v. Johnson,* 632 F.3d 1259, 1261 (D.C. Cir. 2011) ("Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'" (quoting *George*, 407 F.3d at 413)). The Court therefore finds that Ms. Dieng's factual allegations are sufficient at this stage to state a plausible claim for retaliation. Accordingly, the Court **DENIES** AIR's motion to dismiss as to Counts V and VI.

### C. Hostile Work Environment Claims

The Court next considers Ms. Dieng's hostile work environment claims. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (citation omitted). To state a hostile work environment claim, Ms. Dieng must allege "that [her] employer

subjected [her] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (citations and internal quotation marks omitted). "Although a plaintiff need not plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must support such a claim." *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (citation and internal quotation marks omitted). In determining whether Ms. Dieng has alleged facts to support her claim, the Court must evaluate "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201; *see also Baird*, 792 F.3d at 168 ("A hostile environment consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'" (quoting *Morgan*, 536 U.S. at 115)).[6]

Here, Ms. Dieng asserts that she was subjected to a hostile

---

[6] Ms. Dieng relies on a Ninth Circuit decision to support her hostile work environment claims. *See* Pl.'s Opp'n, ECF No. 11 at 8 (citing *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)). The Court will not consider the out-of-Circuit opinion because it is not binding on this Court and Ms. Dieng provides no reasons for this Court to deviate from D.C. Circuit precedent.

work environment based on racial harassment because "she was not treated the same way that Whites were treated on the job." Pl.'s Opp'n, ECF No. 11 at 8. Ms. Dieng points out that "her performance evaluation contained blatant mischaracterizations and downright falsehoods, whereas no Caucasian was treated that poorly[,]" *id.* at 8-9, and that her white co-workers had the ability to telecommute without prior approval, but she could only telecommute with "upper level approval[,]" *id.* at 9. Ms. Dieng contends that several incidents of disparate treatment—her supervisors yelling at her, ignoring her at staff meetings, fabricating her performance evaluations, and revoking her telecommuting privileges—all contributed to a hostile work environment. *Id.* at 8-11. Acknowledging that "no racist comments or utterances" were made in her presence, Ms. Dieng argues that direct evidence is not necessary at the motion to dismiss stage. *Id.* at 9 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). Finally, Ms. Dieng contends that AIR knew about her claims of "racial harassment from the very first meeting with [the Human Resources department]" and that she has "recounted a number of adverse workplace events which created for her a hostile work environment, including incidents occurring more than 300 days prior to the filing of her Charge with the [EECO]." *Id.* at 11.

AIR responds that Ms. Dieng's allegations are insufficient

to "establish that the alleged hostile work environment was based on [her] race." Def.'s Reply, ECF No. 12 at 3. AIR argues that "there are no allegations to connect the alleged racial discrimination by the Program Manager in 2015, to the alleged hostile behavior by the Staff Manager two years later in 2017" and that "there are no allegations that the alleged actions of the Staff Manager were racially motivated." *Id*. AIR contends that the performance evaluation, on its face, is racially neutral and does not support Ms. Dieng's claims that it contains falsehoods or "negative feedback" from others. *Id*. at 4. AIR argues that Ms. Dieng's allegation—that her white co-workers had telecommuting privileges, but she did not have the same privileges—fails to establish that the "alleged harassment was due to her race." *Id*. AIR makes a timeliness argument with respect to Ms. Dieng's 2015 allegations, contending that the allegations of yelling and ignoring her during staff meetings are untimely because Ms. Dieng filed her EEOC charge of discrimination in 2018. *Id*. at 5. Finally, AIR argues that the 2017 alleged misconduct is not sufficiently severe or pervasive to show a hostile work environment. *Id*. at 6. Before addressing each argument, the Court first turns to the parties' timeliness arguments.

### 1.    Timeliness

Title VII requires the "person aggrieved" to file a charge

with the EEOC within 180 days "after the alleged unlawful employment practice occurred," but this period is extended to 300 days if the person "has initially instituted proceedings with a State or local agency." 42 U.S.C. § 2000e-5(e)(1); *see also* D.C. Code § 2-1403.16(a) (DCHRA establishes a one-year limitations period). Because Ms. Dieng filed the EEOC charge in 2018, Am. Compl., ECF No. 8 at 8 ¶¶ 46-47, and she does not allege that she filed a complaint with the District of Columbia's Office of Human Rights, *see id*. at 8 ¶¶ 45-47, she had 180 days from the time of the alleged violation to file her EEOC charge. *See Ashraf-Hassan v. Embassy of France in U.S.*, 878 F. Supp. 2d 164, 171 (D.D.C. 2012) ("Where Plaintiff has failed to pursue her grievances through the state's administrative processes, as here, she cannot invoke the longer presentment [300-day] window and must file her claims within the 180-day window to be timely."). The Court therefore finds that only the allegations of discriminatory acts that occurred within the 180-days window are timely for the purpose of determining Ms. Dieng's hostile work environment claims.

Ms. Dieng relies on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) for the proposition that "an action against a defendant employer for a claim of hostile work environment can include events occurring before the charge-filing period, i.e., occurring more than 300 days before she filed her

claim with the EEOC." Pl.'s Opp'n, ECF No. 11 at 11-12 (emphasis in
original). Ms. Dieng argues that "although the staff meeting
hostility occurred more than 300 days prior to [the] filing [of]
her EEOC Charge, if it is part of the same discriminatory hostile
work environment claim, those acts are included." *Id.* at 12. In
response, AIR neither cites nor addresses *Morgan*. *See* Def.'s Reply,
ECF No. 12 at 5. As previously explained, the 300-day window does
not apply to Ms. Dieng's situation. *See Ashraf-Hassan*, 878 F.
Supp. 2d at 171. *Morgan*, however, supports Ms. Dieng's timeliness
argument.

In *Morgan*, the Supreme Court noted that hostile work
environment claims by "[t]heir very nature involve[ ] repeated
conduct." 536 U.S. at 115. The Supreme Court made clear that an
unlawful employment practice "cannot be said to occur on any
particular day. It occurs over a series of days or perhaps *years*
and, in direct contrast to discrete acts, a single act of
harassment may not be actionable on its own." *Id.* (emphasis added).
The Supreme Court explained:

> A hostile work environment claim is composed
> of a series of separate acts that collectively
> constitute one "unlawful employment
> practice." 42 U.S.C. § 2000e-5(e)(1). The
> timely filing provision only requires that a
> Title VII plaintiff file a charge within a
> certain number of days after the unlawful
> practice happened. It does not matter, for
> purposes of the statute, that some of the
> component acts of the hostile work environment
> fall outside the statutory time period.
> Provided that an act contributing to the claim

27

> occurs within the filing period, the entire
> time period of the hostile environment may be
> considered by a court for the purposes of
> determining liability.

*Id.* at 117. In other words, "a hostile work environment claim . . . may properly be viewed as a 'continuing violation' under both Title VII and the DCHRA." *Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 219, 233 (D.D.C. 2016) (citing *Morgan*, 536 U.S. at 122; *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003)).

Here, AIR does not dispute that Ms. Dieng's 2017 allegations in support of her hostile work environment claims are timely. *See* Def.'s Reply, ECF No. 12 at 6. Ms. Dieng asserts two specific acts of hostility that occurred in 2017: (1) "lies as to her performance, which occurred on several occasions"; and (2) the "denial of teleworking." Pl.'s Opp'n, ECF No. 11 at 10. Ms. Dieng's hostile work environment theory is also based on AIR's alleged misconduct in 2015. *See id.* at 10. According to Ms. Dieng, "[t]he yelling at [her] in staff meetings was most humiliating. However, it became worse after she reported her race claim to [the Human Resources department]. Then she was totally ignored, unable to ask questions or contribute to work conversations in the meeting." *Id.* Ms. Dieng alleges other acts of hostility without providing the exact dates. *See* Am. Compl., ECF No. 8 at 4 ¶¶ 20-21. Because Ms. Dieng only had to file an

EEOC charge within 180 days "of any act that is part of the hostile work environment," *see Morgan*, 536 U.S. at 118, the Court therefore finds that all of her allegations are timely.

## 2. Failure to State a Claim

Having found that Ms. Dieng's hostile work environment claims are timely, the Court turns to the merits of those claims. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *George*, 407 F.3d at 416 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Here, Ms. Dieng alleges that certain incidents at AIR were humiliating. *See, e.g.*, Pl.'s Opp'n, ECF No. 11 at 10; Am. Compl., ECF No. 8 at 3 ¶¶ 13-16, 4 ¶¶ 20-21, 5 ¶¶ 24-30. But the alleged incidents in Ms. Dieng's Amended Complaint were not "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (citation and internal quotation marks omitted); *see also Baird*, 792 F.3d at 168-69 (explaining that "Title VII is aimed at preventing discrimination, not auditing the responsiveness of human resources departments").

Ms. Dieng argues that the "lies as to her performance,

which occurred on several occasions" constitute a hostile work environment. Pl.'s Opp'n, ECF No. 11 at 10. Because Ms. Dieng's Amended Complaint incorporates by reference the 2016 performance evaluation, *see* Am. Compl., ECF No. 8 at 6 ¶ 31, the Court will consider that document for purposes of evaluating whether Ms. Dieng has stated a claim, *see McManus v. Williams*, 519 F. Supp. 2d 1, 5 (D.D.C. 2007) (Sullivan, J.).[7] The Court agrees with AIR's argument that the 2016 performance evaluation does not contain the phrase "negative feedback" and that the evaluation fails to support her allegations that she received negative feedback from others. *See* Def.'s Reply, ECF No. 12 at 4. The 2016 performance evaluation states, in relevant part, that "[Ms. Dieng] pretty consistently gets *feedback* from others on bugs or issues in her code when code reviews are completed." Def.'s Ex. 1, ECF No. 9-2 at 2 (emphasis added). While AIR provided as an exhibit to its motion to dismiss the 2016 performance evaluation, AIR did not attach Ms. Dieng's other evaluations to address her other allegations—she had a "perfect record" at AIR, Am. Compl., ECF No. 8 at 7 ¶ 40, she sought "other independent evaluations of her work[,]" *id*. at 7 ¶ 41, and she "received no

---

[7] When ruling on a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

negative feedback from any of her co-worker reviewers[,]" *id*. Nonetheless, such allegations are not sufficiently severe or pervasive to state a plausible hostile work environment claim. *See Laughlin v. Holder*, 923 F. Supp. 2d 204, 216-21 (D.D.C. 2013) (finding that plaintiff failed to state a hostile work environment claim based on certain performance-based actions, such as alleged manipulation of performance evaluations).

Ms. Dieng points to other incidents in support of her hostile work environment claims: (1) the "denial of teleworking," Pl.'s Opp'n, ECF No. 11 at 10; (2) yelling at her during staff meetings, *id.*; (3) ignoring her at those meetings, *id.*; and (4) "constant questioning of [her] work," Am. Compl., ECF No. 8 at 4 ¶ 21. This Court and other courts in this jurisdiction have found that similar allegations of misconduct are not sufficiently severe or pervasive to state a hostile work environment claim. *See, e.g.*, *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014) (Sullivan, J.) (dismissing hostile work environment claim where allegations of "promotion denials, a subjective performance review, and being hired at a lower grade than Caucasian employees" were not sufficiently severe or pervasive); *Koch v. White*, 134 F. Supp. 3d 158, 167-68 (D.D.C. 2015) (finding that denials of certain accommodations, including request for "part-time telework arrangement," did not create hostile work environment claim); *Casey v. Mabus*, 878 F. Supp. 2d

175, 189 (D.D.C. 2012) (finding that supervisor's "loud and aggressive" statements and actions of "slamm[ing] his hands on the desk" during meeting failed to constitute hostile work environment). Furthermore, the D.C. Circuit has held that workplace tribulations, such as "petty insults, vindictive behavior, and angry recriminations[,]" are not actionable under Title VII. *Brooks v. Grundmann*, 748 F.3d 1273, 1277-78 (D.C. Cir. 2014) (citation omitted). The Court therefore finds that the factual allegations set forth in Ms. Dieng's Amended Complaint fail to state a hostile work environment claim. Accordingly, the Court **GRANTS** AIR's motion to dismiss as to Counts I and II.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** AIR's Motion to Dismiss. The Court **DISMISSES WITHOUT PREJUDICE** Ms. Dieng's hostile work environment and gender discrimination claims. Ms. Dieng's remaining claims are her discrimination and retaliation claims based on her race. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed: **Emmet G. Sullivan**
**United States District Judge**
**September 26, 2019**