**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

YACINE DIENG

        Plaintiff,

v.

AMERICAN INSTITUTES FOR
RESEARCH IN THE BEHAVIORAL
SCIENCES,

        Defendant.

No. 18-cv-1220 (EGS)

---

<u>**MEMORANDUM OPINION**</u>

Plaintiff Yacine Dieng ("Ms. Dieng") brings this action against Defendant American Institutes for Research in the Behavioral Sciences ("AIR") claiming: (1) "Termination Taken Against Plaintiff on the Basis of Race" in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq*. ("Title VII") (Count III); (2) "Termination Action Taken Against Plaintiff on the Basis of Race in violation of the District of Columbia's Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 (Count IV); (3) "Termination Action Taken Against Plaintiff on the Basis of Retaliation" in violation of Title VII (Count V); and (4) "Termination Action Against Plaintiff on the Basis of Retaliation" in violation of the DCHRA (Count VI).[1] Pending

---

[1] On September 26, 2019, the Court dismissed without prejudice Ms. Dieng's hostile work environment and discrimination claims based on gender. *See* Mem. Op., ECF No. 14 at 32.

before the Court is Defendant's Motion for Summary Judgment.
Upon careful consideration of the motion, the opposition, the
reply thereto, the applicable law, and the entire record herein,
and because no reasonable juror could conclude that Defendant
discriminated against Plaintiff when it terminated her
employment, the Court **GRANTS** Defendant's Motion for Summary
Judgment.

## I.  Background

### A. Factual Background

Except where indicated, the following facts are undisputed.
AIR hired Ms. Dieng as a Senior Database Engineer on its
reporting team (the "ORS team" or "ORS department") in February
2013. *See* Def.'s Reply to Pl.'s Corrected Counterstatement of
Material Facts ("Parties' SOMF"), ECF No. 60 ¶¶ 1–2, 9.[2] While
employed at AIR, Ms. Dieng's supervisor was Jeffrey Burger ("Mr.
Burger"), a white male. *Id.* ¶¶ 16–18. Sachin Shah ("Mr. Shah"),
an Asian male from India, was the ORS team's Project Manager.
*Id.* ¶¶ 13–14. Ms. Dieng's claims arise from several key
incidents, which the Court describes below.

---

[2] When citing electronic filings throughout this Opinion, the
Court cites to the ECF header page number, not the page number
of the filed document with the exception of deposition
testimony, which is to the page number of the deposition
transcript.

### 1. Ms. Dieng's 2015 Meeting with Human Resources

As the Project Manager, Mr. Shah led daily meetings with the ORS team where the team "discuss[ed] tasks and [got] input from the entire team." *Id.* ¶¶ 19-20. During a daily meeting in September 2015, Mr. Shah began to discuss something with Ms. Dieng that did not involve the rest of the team. *Id.* ¶ 22. Ms. Dieng responded, "Well, can we take it off line [*sic*]"—a response she had heard others say to Mr. Shah in the past. *Id.* ¶¶ 23-24. In response, Mr. Shah stated that "he was sick and tired of this[,] and he wasn't going to take anymore comments like this," and asked Ms. Dieng to leave "if she was not happy with the meeting." *Id.* ¶¶ 25-26. Feeling disrespected, Ms. Dieng stopped attending the daily meetings in-person and joined via telephone. *Id.* ¶¶ 28-29; *see also* Pl.'s Ex. 17, Dep. of Jeffrey Burger ("Burger Dep."), ECF No. 55-2 at 59:16-18.

When Mr. Burger inquired about why Ms. Dieng stopped attending the team's daily meetings, Ms. Dieng explained the incident with Mr. Shah and "asked Mr. Burger to mediate or resolve the issue." Parties' SOMF, ECF No. 60 ¶¶ 30-31. Mr. Burger suggested that she speak with Mr. Shah directly, responding that "he did not want to get involved." *Id.* ¶ 32. Thereafter, on September 28, 2015, Ms. Dieng reached out to Kasey Mutzel ("Ms. Mutzel") in Human Resources ("HR") for assistance. *See id.* ¶¶ 33-34. When speaking about the incident,

Ms. Dieng told Ms. Mutzel that she had never seen Mr. Shah react in such a way to anyone else on their team. *Id.* ¶¶ 35-36. Ms. Dieng testified that she did not tell Ms. Mutzel that Mr. Shah's treatment of her was based on her race because she "didn't know what it was originally." Def.'s Reply Ex. 2, Dep. of Yacine Dieng ("Dieng Dep."), ECF No. 60-3 at 79:6-14. She also testified that in an email discussion with Ms. Mutzel she told Ms. Mutzel that the disrespect and verbal abuse "seems to be related to the fact that I am the only black woman in the group." *Id.* at 82:20-22; *see also* Pl.'s Ex. 1, Email from Y. Dieng to K. Mutzel Re: Follow Up ("HR Follow-Up Email"), ECF No. 55-1 at 2-3. AIR, however, challenges the authenticity of this exhibit. *See* Parties' SOMF, ECF No. 60 ¶ 181.

On October 2, 2015, Ms. Dieng, Mr. Shah, and Ms. Mutzel met to discuss the incident. *See id.* ¶¶ 37-38. During the meeting, Mr. Shah apologized, stating that "he didn't realize that he had offended Ms. Dieng." *Id.* Ms. Dieng testified that she did not talk about race during the meeting, but that she did say she felt discriminated against. Dieng Dep., ECF No. 60-3 at 87:7-13. After the meeting, HR issued a Form Issue Report stating that Ms. Dieng had contacted HR because she felt "disrespected and targeted" by Mr. Shah and that during the meeting, Ms. Dieng and Mr. Shah "agreed to communicate more with one another[ ] and

appeared to be satisfied with the outcome of the meeting." Pl.'s
Ex. 6, Sept. 28, 2015 Form Issue Rep., ECF No. 55-1 at 22.

### 2. Ms. Dieng's 2016 Evaluation Report

Mr. Burger completed Ms. Dieng's 2016 performance appraisal
on December 31, 2016. *See* Parties' SOMF, ECF No. 60 ¶¶ 50-51.
Ms. Dieng believes that the evaluation contains one negative
statement: "Yacine pretty consistently gets feedback from others
on bugs or issues in her code when code reviews are completed."
*Id.* ¶ 54. The remainder of the performance evaluation rated Ms.
Dieng's performance as "consistently met expectations" and noted
that "[s]he is a key contributor to the team." *Id.* ¶¶ 58-60.
While Mr. Burger testified that he believed he received some
feedback for the evaluation from Mr. Shah, *id.* ¶ 52; Mr. Shah
testified that he did not provide any information about Ms.
Dieng's work for this evaluation. *Id.*

When asked about factors leading to Ms. Dieng's
termination, Stephen Kromer ("Mr. Kromer"), President of AIR
Assessment, testified that he believed that "bugs" in Ms.
Dieng's code was a performance issue that contributed to her
termination. *Id.* ¶ 56; Pl.'s Ex. 13, Dep. of Stephen Kromer
("Kromer Dep."), ECF No. 36-7 at 42-43.[3]

---

[3] AIR points to Mr. Kromer's testimony that he did not review Ms.
Dieng's 2016 performance evaluation, Parties' SOMF, ECF No. 60
¶¶ 56-57; but this does not negate his testimony that the "bugs"
in Ms. Dieng's code contributed to her termination.

### 3. Teleworking Agreement

After Ms. Dieng teleworked "pretty regularly" throughout 2016 and into 2017, *see* Parties' SOMF, ECF No. 60 ¶ 61; Mr. Burger informed Ms. Dieng that if she was going to be teleworking on a more permanent basis it needed to be approved by Selina Tolosa ("Ms. Tolosa") and Mr. Kromer. *Id.*; Pl.'s Ex. 8, Email Chain Between J. Burger & Y. Dieng Re: Working from Home ("Pl.'s Ex. 8"), ECF No. 55-1 at 26–27. Ms. Tolosa, the Vice President of Software Engineering, is an Asian female, and Mr. Kromer is a white male. *See* Parties' SOMF, ECF No. 60 ¶¶ 4–7.

At the time, AIR's teleworking policy provided: "Although an individual's work location arrangement may be modified to accommodate needs outside of work, the primary focus of any teleworking arrangement must be on satisfying work demands and job performance. Telework is not designed to be a replacement for childcare or eldercare." *Id.* ¶ 77.

Ms. Dieng testified that Mr. Burger told her not to worry about filling out a form, and he would talk to Ms. Tolosa and Mr. Kromer about her teleworking. *Id.* ¶ 70. However, Mr. Burger's emails indicate that he told her to fill out the form. *Id.* Ms. Dieng submitted the teleworking form on September 22, 2017. *Id.* ¶ 204. Ms. Tolosa never approved Ms. Dieng's teleworking form. *Id.* ¶ 80.

### 4. Ms. Dieng's Insubordination and Termination

In September 2017, Ms. Dieng received a formal
insubordination charge for her failure to follow directives from
Mr. Shah and Mr. Burger. While working on a software performance
issue with Maneesh Rampally ("Ms. Rampally"), Ms. Dieng decided
that she needed to change the code to avoid "deadlocks." *Id.* ¶¶
91-92. Mr. Shah requested that Ms. Dieng run her proposed
solution to the deadlocks by Daniel Nagdimunov ("Mr.
Nagdimunov"), a Database Engineer on the AIR networking team.
*Id.* ¶¶ 94-95, 102. Ms. Dieng declined to run the issue by Mr.
Nagdimunov because she felt like she was being treated
differently than the rest of her team by being required to have
someone on another team review her code. *Id.* ¶ 118. When she did
not work with Mr. Nagdimunov, Mr. Burger told Ms. Dieng he would
have to write her up for insubordination. *See* Def.'s Ex. 21,
Sept. 21, 2017 Form Issue Rep., ECF No. 25-3 at 187. After this
incident, Mr. Burger and Ms. Dieng met with HR, where Mr. Burger
also made Ms. Dieng aware of five other performance issues.
Parties' SOMF, ECF No. 60 ¶ 122.

A few months later, in February 2018, Ms. Dieng's
employment was terminated after AIR discovered that she violated
the Production Control Board ("PCB") Policy. The PCB Policy
requires a team member to submit a PCB document, "outlin[ing]
steps to deploy the fix to the software" to the board for

approval prior to deploying a change to a client's production system. *Id.* ¶¶ 128–134. On January 10, 2018, "Ms. Dieng added an index to [a] client's production system without a PCB." *Id.* ¶ 144. Ms. Dieng asserts that Mr. Shah told her to move forward with the deployment. *See id.* ¶ 145. However, "Mr. Shah advised Mr. Burger that he was not aware that Ms. Dieng was going to deploy her solution into production." *Id.* After Ms. Tolosa became aware of Ms. Dieng's violation of the PCB Policy, Ms. Tolosa emailed HR recommending termination of her employment. *Id.* ¶¶ 148–150. Ms. Dieng's employment was terminated on February 2, 2018. *Id.* ¶ 158.

### B. Procedural History

Pending before the Court is AIR's Motion for Summary Judgment as to Ms. Dieng's remaining claims. *See* Def.'s Mem. in Support of Mot. for Summ. Judgment ("Def.'s Mot. Summ. J."), ECF No. 25-1. After the Court granted several motions for extensions of time, Ms. Dieng filed her opposition. *See* Pl.'s Opp'n to Def. AIR's Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 36. AIR filed its reply on February 12, 2021. *See* Def.'s Reply in Support of Mot. Summ. J. ("Def.'s Reply"), ECF No. 37. However, Ms. Dieng repeatedly failed to comply with the Court's Standing Order to provide a statement of material facts not in dispute, and on September 15, 2022, the Court stayed proceedings. *See* Minute Order (Sept. 15, 2022). The Court lifted the stay and ordered

that the facts in Defendant's Statement of Material Facts were deemed admitted on November 15, 2022. *See* Minute Order (Nov. 15, 2022).

On November 29, 2022, Ms. Dieng's counsel notified the Court of his inability to represent her due to a medical disability. *See* Pl.'s Mot. to Restore Stay & Notice of Disability, ECF No. 40. Over AIR's objection, the Court granted Ms. Dieng's Motion to Restore the Stay, Minute Order (Feb. 17, 2023); and after Ms. Dieng obtained new counsel, the Court vacated its Minute Order from November 15, 2022, ordering that the facts in Defendant's Statement of Material Facts were deemed admitted, *see* Minute Order (Nov. 21, 2023). The Court permitted the parties to submit supplemental briefing. *See* Pl.'s Supp. Brief in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Supp. Brief"), ECF No. 54; Def.'s Supp. Brief in Reply to Pl.'s Supp. Brief in Opp'n to Def.'s Mot. Summ. J. ("Def.'s Supp. Brief"), ECF No. 61. AIR's Motion for Summary Judgment is now fully briefed and ripe for the Court's adjudication.

## II. Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). A dispute is "genuine" if "the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Id.* The moving party bears the burden
of "informing the district court of the basis for its motion" as
well as "identifying those portions of the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, which it believes
demonstrate the absence of a genuine issue of material fact."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal
quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A).

　　To defeat summary judgment, the nonmoving party must "go
beyond the pleadings" and "designate specific facts showing that
there is a genuine issue [of material fact] for trial." *Celotex
Corp.*, 477 U.S. at 324 (internal quotation marks omitted). In
evaluating a summary judgment motion, "[t]he evidence of the
nonmovant is to be believed, and all justifiable inferences are
to be drawn in his favor." *Anderson*, 477 U.S. at 255. However,
the nonmoving party's opposition "must consist of more than mere
unsupported allegations or denials and must be supported by
affidavits or other competent evidence" in the record. *Musgrove
v. District of Columbia*, 775 F. Supp. 2d 158, 164 (D.D.C. 2011);
*see also Celotex Corp.*, 477 U.S. at 324. If the evidence
favoring the nonmoving party is "merely colorable, or is not

significantly probative, summary judgment may be granted."
*Anderson*, 477 U.S. at 249–50 (internal citations omitted).

## III. Analysis

Ms. Dieng alleges two claims under Title VII and the DCHRA:
(1) discrimination based on her race; and (2) retaliation. *See*
Pl.'s Opp'n, ECF No. 36; Pl.'s Supp. Brief, ECF No. 54. Because
the legal standards for establishing these claims under Title
VII and the DCHRA are substantively the same, *see Carpenter v.
Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)
(explaining that, "[i]n interpreting its Human Rights Act[,] the
District of Columbia . . . generally seems ready to accept the
federal constructions of Title VII, given the substantial
similarity between it and the [DCHRA]"); the Court will analyze
Ms. Dieng's claims under these statutes together. First, the
Court addresses AIR's argument that Ms. Dieng failed to exhaust
her administrative remedies and is thus barred from bringing
this lawsuit.

### A. Exhaustion of Administrative Remedies

Prior to filing a civil action, "Title VII requires that a
person complaining of a violation file an administrative charge
with the [United States Equal Employment Opportunity Commission
("EEOC")] and allow the agency time to act on the charge." *Park
v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). While the
charge-filing requirement is not a jurisdictional prerequisite,

it is a mandatory procedural hurdle, *see Fort Bend Cty v. Davis*, 587 U.S. 541, 552 (2019); intended to "giv[e] the charged party notice of the claim and narrow[ ] the issues for prompt adjudication and decision." *Park*, 71 F.3d at 907 (citation and internal quotations omitted). As an affirmative defense, the defendant bears the burden of proving that the plaintiff failed to exhaust. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). "If the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense." *Id.*

Ms. Dieng filed a charge of discrimination on February 22, 2018, just twenty-days after she was fired from AIR. Def.'s Ex. 2, Charge of Discrimination ("EEOC Charge"), ECF No. 25-3 at 73. In response to the form's question on what basis she was discriminated on, Ms. Dieng checked the box for "other." *Id.* Ms. Dieng noted that the discrimination occurred on February 2, 2018, and wrote: "I was formerly employed by Respondent. On February 2, 2018, I was discharged. I believe I was wrongfully terminated, in violation of Title VII of the Civil Rights Act of 1964, as amended." *Id.* The EEOC issued Ms. Dieng a notice of her right to sue on the same day. Def.'s Ex. 3, Notice of Dismissal from EEOC, ECF No. 25-3 at 75.

AIR argues that Ms. Dieng's administrative charge fails to meet the procedural hurdle under Title VII—and thus failed to

put it on notice of her claims—because it "says nothing about termination based on race or retaliation." Def.'s Mot. Summ. J., ECF No. 25-1 at 28. In response, Ms. Dieng asserts that her charge, when "liberally construed," sufficiently put AIR on notice of her claims because it stated that she was "wrongfully terminated, in violation of Title VII," and "AIR was aware of her race and sex[ ] and had notice of her previous complaints of disparate treatment while employed." Pl.'s Supp. Brief, ECF No. 54 at 24–25.

The Court concludes that AIR did not carry its burden of establishing that Ms. Dieng's charge did not provide them with sufficient notice such that she failed to exhaust her administrative remedies. While sparse in detail, Ms. Dieng's charge explicitly states that she believed she was terminated in violation of Title VII. Moreover, AIR fails to cite any authority indicating that the failure to check the box for "race" on the charge is fatal to exhaustion. Ms. Dieng's charge— together with the fact that she had spoken with HR about being discriminated against—was sufficient to notify AIR that she might file a Title VII action based on her termination, allowing

AIR to investigate whether her termination was discriminatory or retaliatory.[4]

Accordingly, the Court concludes that Ms. Dieng exhausted her administrative remedies for her claims based on her termination.[5]

### B. Ms. Dieng's Discrimination and Retaliation Claims

Under Title VII, it is unlawful for an employer to: (1) "discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of her race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1); or (2) retaliate against any individual for participating in a protected activity, 42 U.S.C. § 2000e-3(a).

Discrimination and retaliation claims are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp.*

---

[4] Because whether Ms. Dieng informed HR that her treatment was race-based is disputed, the Court does not rely on that in making this determination.

[5] It is unclear from Ms. Dieng's summary judgment briefing the extent to which she claims that she was subject to additional adverse employment actions. To the extent she is arguing that her prior insubordination or the denial of a permanent telework schedule are separate adverse employment actions, the Court concludes that these are unexhausted claims because the only one mentioned in the EEOC charge was her termination. EEOC Charge, ECF No. 25-3 at 73. "Each discrete adverse employment action triggers the statutory exhaustion requirement." *Reshard v. Lahood*, No. 87-2794, 2010 WL 1379806, at *13 (D.D.C. Apr. 7, 2010) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to the unexhausted claims.

*v. Green*, 411 U.S. 792, 802–05 (1973). As the Court of Appeals

for the District of Columbia Circuit ("D.C. Circuit") has

instructed:

> A plaintiff must first establish her prima facie
> case. To state a prima facie case of
> discrimination, a plaintiff must allege she
> is part of a protected class under Title VII,
> she suffered a cognizable adverse employment
> action, and the action gives rise to an inference
> of discrimination. *Stella v. Mineta,* 284 F.3d
> 135, 145 (D.C. Cir. 2002). For a retaliation
> claim, the plaintiff must allege that she engaged
> in activity protected by Title VII, the employer
> took adverse action against her, and the employer
> took that action because of the employee's
> protected conduct. *Hamilton v. Geithner,* 666
> F.3d 1344, 1357 (D.C. Cir. 2012).
>
> If the plaintiff clears that hurdle, the burden
> shifts to the employer to identify the
> legitimate, nondiscriminatory or non-retaliatory
> reason on which it relied in taking the
> complained-of action. *Holcomb v.*
> *Powell,* 433 F.3d 889, 896 (D.C. Cir. 2006).
> Assuming the employer proffers such a reason,
> the "central question" at summary judgment
> becomes whether "the employee produced
> sufficient evidence for a reasonable jury to find
> that the employer's asserted nondiscriminatory
> or nonretaliatory reason was not the actual
> reason and that the employer intentionally
> discriminated or retaliated against the
> employee." *Allen v. Johnson,* 795 F.3d 34, 39,
> No. 13-5170, 2015 WL 4489510, at *3 (D.C. Cir.
> July 24, 2015) (brackets omitted) (quoting
> [*Brady v. Off. of Sergeant at Arms*, 520 F.3d 490,
> 494 (D.C. Cir. 2008)]); *see also Hamilton,* 666
> F.3d at 1351.
>
> A plaintiff may support an inference that
> the employer's stated reasons were pretextual,
> and the real reasons were prohibited
> discrimination or retaliation, by citing the
> employer's better treatment of similarly

situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

### 1. **Ms. Dieng's Discriminatory Termination Claim**

Ms. Dieng claims that she was terminated because of her race in violation of Title VII and the DCHRA. Pl.'s Opp'n, ECF No. 36 at 15. There is no dispute that Ms. Dieng's termination constitutes an adverse employment action. *See generally* Def.'s Mot. Summ. J., ECF No. 25-1 at 21; *Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009) (holding that an employment decision such as termination is "conclusively presumed to be [an] adverse employment action[ ]"). However, AIR has identified a legitimate, non-discriminatory reason for terminating Ms. Dieng—her insubordination and subsequent violation of company policy. *See* Def.'s Mot. Summ. J., ECF No. 25-1 at 22–23. Accordingly, the Court must not address whether Ms. Dieng has stated a prima facie case, and instead, turns directly to whether Ms. Dieng "produced sufficient evidence for a reasonable jury to find that [AIR's] asserted non-discriminatory reason was not the actual reason." *Brady*, 520 F.3d at 494 ("[W]here an employee has suffered an adverse employment action and an

employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.") (emphasis in original). The Court concludes that she has not.

AIR produced deposition testimony indicating that Ms. Dieng was terminated due to a violation of the PCB Policy combined with prior insubordination. *See* Def.'s Ex. 7, Dep. of Selina Tolosa ("Tolosa Dep."), ECF No. 25-3 at 22:1-4, 55:6-56:16. Additionally, AIR provided additional supporting evidence, including the emails recommending Ms. Dieng's termination, reports filed with HR, and other testimony regarding the nature of the PCB Policy. *See, e.g.*, Def.'s Ex. 20, Email Chain Between L. Sepanloo, D. Kilpatrick & M. Fanning Re: Y. Dieng Recommend Termination of Employment, ECF No. 25-3 at 185-86; Def.'s Ex. 19, Aff. of Lesley Sepanloo, ECF No. 25-3 at 183-84; Tolosa Dep, ECF No. 25-3 at 41:2-19, 48:16-49:15. Ms. Dieng attempts to show that AIR's stated reason for her termination was not the actual reason—and thus pretexual—in two ways.

First, Ms. Dieng argues that she never violated the PCB Policy. Pl.'s Supp. Brief, ECF No. 54 at 22-23. Ms. Dieng, through her deposition testimony and affidavit, asserts that a PCB document was not required because the problem with the client's code required an urgent fix, and Mr. Shah gave her

verbal approval to deploy the index. *See* Pl.'s Ex. 20, Aff. of Yacine Dieng ("Dieng Aff."), ECF No. 55-2 at 45-49; Pl.'s Supp. Brief, ECF No. 54 at 22-23. Regardless, Ms. Dieng claims that it was Mr. Shah's responsibility to create the PCB document, and his failure to do so does not mean *she* violated the PCB Policy. *See* Pl.'s Supp. Brief, ECF No. 54 at 22-23.

However, Ms. Dieng's argument ignores the remainder of the evidence, which indicates that in making its decision to terminate Ms. Dieng, AIR relied on Mr. Shah's statement that he was unaware that Ms. Dieng was deploying an index to the client's production without PCB approval. *See* Parties' SOMF, ECF No. 60 ¶ 145. The question is not whether Ms. Dieng actually violated the policy, but rather "whether [AIR] honestly and reasonably believed that the underlying [PCB violation] occurred." *Brady*, 520 F.3d at 496. Ms. Dieng has not produced any evidence demonstrating that Ms. Tolosa, Mr. Kromer, or Mr. Burger knew that she did not violate the PCB Policy or that their belief that the violation occurred was unreasonable. Accordingly, the Court concludes that Ms. Dieng has not provided sufficient evidence to allow a reasonable juror to conclude that AIR did not honestly believe that Ms. Dieng violated the PCB Policy, such that this evidence shows pretext.

Next, Ms. Dieng attempts to establish that AIR treated other employees of a different race more favorably. Ms. Dieng

points to AIR developer, Mr. Nagdimunov, a white and Asian male,
who was not terminated after violating the PCB Policy. *See* Pl.'s
Opp'n, ECF No. 36 at 22.[6] While the evidence clearly establishes
that Mr. Nagdimunov also violated the PCB policy, the Court
concludes that no reasonable juror could find that he is an
adequate comparator to Ms. Dieng. Unlike her employment history
at AIR, Ms. Dieng has presented no evidence that Mr. Nagdimunov
was formerly written up for insubordination or that anyone
expressed concern about his performance at work prior to when he
violated the PCB Policy. *See, e.g.*, *Webster v. U.S. DOE*, 443 F.
Supp. 3d 67, 86 (D.D.C. 2020) (concluding that plaintiff was not
similarly situated to named comparators because there was no
evidence comparators had the same behavioral or performance
issues). Additionally, when Mr. Nagdimunov violated the PCB
Policy, he had only been working at AIR for a couple months,
while Ms. Dieng had been at AIR for almost five years and knew
the significance of abiding by the PCB Policy. *See* Parties'
SOMF, ECF No. 60 ¶ 225. The differing circumstances fail to
establish that AIR treated other employees of a different race
more favorably than Ms. Dieng.

---

[6] Ms. Dieng asserts that Mr. Shah also violated the PCB Policy
but was not fired. *See* Pl.'s Opp'n, ECF No. 36 at 23. However,
Ms. Dieng has failed to produce evidence that AIR knew or
believed that Mr. Shah violated the policy.

Finally, Ms. Dieng asserts that the "disproportionate" decision to terminate her and her prior insubordination write-ups were racially motivated, tainting her termination. While Mr. Kromer testified that he was the final decision-maker for terminating Ms. Dieng's employment, Ms. Dieng argues that Mr. Kromer made that decision based on Ms. Tolosa's recommendation, and that racial animus can be inferred from Ms. Tolosa's actions. Pl.'s Opp., ECF No. 36 at 16-18. 20-22. However, as explained above, Ms. Dieng has failed to support an inference of racial animus with any evidence establishing that Ms. Tolosa's recommendations were unreasonable, against AIR policy or procedure, or differed from how she treated similarly situated employees of a different race.

Accordingly, the Court **GRANTS** AIR's Motion for Summary Judgment as to Ms. Dieng's claims of discrimination on the basis of her race.

### 2. Ms. Dieng's Retaliation Claims

To establish a claim of retaliation, an employee must establish that she: (1) "engaged in protected activity," (2) was "subjected to adverse action by the employer," and (3) that "there existed a causal link between the adverse action and the protected activity." *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (internal quotation marks omitted).

Ms. Dieng's retaliation claims initially stated that she
engaged in protected activity when she met with AIR's HR staff
after the daily meeting incident with Mr. Shah. Am. Compl., ECF
No. 7-1 ¶ 11. However, Ms. Dieng's briefing fails to address
AIR's arguments that there is no connection between this meeting
and her termination. *See generally* Pl.'s Opp'n, ECF No. 36;
Pl.'s Supp. Brief, ECF No. 54. Nevertheless, even if the
nonmoving party fails to respond to the motion for summary
judgment, or portions thereof, a court cannot grant the motion
for the reason that it was conceded. *Winston & Strawn, LLP v.
McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). The burden is always
on the movant to demonstrate why summary judgment is
warranted. *Id.* A district court "must determine for itself that
there is no genuine dispute as to any material fact and that the
movant is entitled to judgment as a matter of law, and then
'should state on the record the reasons for granting or denying
the motion.'" *Id.* at 508–09 (quoting Fed. R. Civ. P. 56(a)).

Ms. Dieng has failed to establish that she engaged in
protected activity when she met with HR to discuss the daily
meeting incident. There is no factual dispute that Ms. Dieng met
with Mr. Shah and Ms. Mutzel on October 2, 2015 to discuss the
September 2015 daily meeting incident. *See* Parties' SOMF, ECF
No. 60 ¶¶ 37-38. There is also no factual dispute that Ms. Dieng
did not raise her race as a reason for Mr. Shah's behavior

toward her either when she met with Ms. Mutzel on September 28,
2015, *id.* ¶¶ 33-34; *see also* Dieng Dep., ECF No. 60-3 at 79:6-14
(Ms. Dieng testified that she did not tell Ms. Mutzel that Mr.
Shah's treatment of her was based on her race because she
"didn't know what it was originally"); nor during the meeting
with Mr. Shah and Ms. Mutzel on October 2, 2015, Dieng Dep., ECF
No. 60-3 at 87:7-13. Ms. Dieng did testify that she later
informed Ms. Mutzel via email that the disrespect and verbal
abuse "seems to be related to the fact that I am the only black
woman in the group." *Id.* at 82:20-22; *see also* HR Follow-Up
Email, ECF No. 55-1 at 2-3. AIR, however, challenges the
authenticity of the email exhibit. *See* Parties' SOMF, ECF No. 60
¶ 181. Plaintiff has failed to attest to the authenticity of the
email. Therefore, the Court will disregard it. And in any event,
it is undisputed that Ms. Dieng did not discuss race during the
October 2, 2015 meeting. For these reasons, Ms. Dieng has not
established that she engaged in protected activity.

Furthermore, Ms. Dieng cannot establish a causal connection
between the October 2, 2015 meeting and her termination nearly
two and a half years later on February 2, 2018. "When 'mere
temporal proximity' is the only 'evidence of causality,' the
Court has held that 'the temporal proximity must be very
close.'" *Spence v. United States Dep't of Veteran's Affairs,* 109
F.4th 531, 540 (D.C. Cir. 2014) (quoting *Clark Cnty. Sch. Dist.*

*v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (cleaned up)). "We sometimes accept an adverse employment action occurring within three to four months of the protected activity as sufficient to allow an inference of causation." *Id*. For the same reason, assuming without deciding, that the performance evaluation completed on December 31, 2016 and the September 2017 denial of her request to telework constitute adverse employment actions, Ms. Dieng cannot establish a causal connection between the October 2, 2015 meeting and either putative adverse employment actions.

For these reasons, no reasonable juror could find that Ms. Dieng was retaliated against when she was terminated, nor as a result of certain statements on her December 31, 2016 performance evaluation, nor when her formal request to telework was not approved.

In her supplementary briefing, Ms. Dieng argues that she engaged in protected activity when she refused to follow the "discriminatory" order from Mr. Shah and Mr. Burger on September 21, 2017 to review her code with Mr. Nagdimunov. Pl.'s Supp. Brief, ECF No. 54 at 11-12; Pl.'s Corrected Counter-Statement of Material Facts, ECF No. 54-1 ¶ 164. Not only does AIR challenge the merits of Ms. Dieng's argument, but it also points out that this is a "new theory of liability" that Ms. Dieng is not

permitted to raise at this juncture. Def.'s Supp. Brief, ECF No. 61 at 5-9.

The Court agrees that Ms. Dieng's attempt to raise her refusal to review her code with Mr. Nagdimunov as the protected activity giving rise to retaliation is impermissible. Until now, the only protected activity Ms. Dieng claimed to have engaged in was her 2015 meeting with AIR's HR staff after the incident with Mr. Shah during a daily meeting. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 11 at 14-15 (stating that Ms. Dieng engaged in protected activity when she reported her supervisor's race discrimination to HR); Def.'s Reply Ex. 1, Pl.'s Answers to Def.'s Interrogs., ECF No. 60-2 at 3-4 (listing only the 2015 meeting with HR as a protected activity). Nor did Ms. Dieng list the incident with Mr. Nagdimunov in her first attempt to respond to AIR's Statement of Material facts. *See generally* Pl.'s Counter-Statement of Facts, ECF No. 34-1. The attempt to salvage Ms. Dieng's retaliation claims through her summary judgment opposition is clearly not allowed where, as here, these allegations were not raised in her Amended Complaint, discovery responses, or any prior briefing. *See, e.g.*, *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 75 (D.D.C. 2019) ("Plaintiffs cannot use summary judgment briefing to press claims not raised in their complaints."); *Simpkins v. Jacobs Eng'g Grp.*, No. 19-cv-0447, 2021 WL 5182098, at *6 n.3 (D.D.C. Sept. 29, 2021)

(concluding that plaintiff's attempt to "change her theory of when she took part in protected activity" through her summary judgment briefing was improper). Therefore, the Court will not consider Ms. Dieng's new argument that her refusal to follow Mr. Shah and Mr. Burger's order to seek assistance with her code was a protected activity for which she was retaliated against. For this reason, the Court need not reach the merits of Ms. Dieng's argument.

For these reasons, the Court **GRANTS** AIR's Motion for Summary Judgment as to Ms. Dieng's retaliation claims.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 25-1. A separate order accompanies this Memorandum.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**United States District Judge**
**April 8, 2025**